Filed 4/14/23  P. v. Cardona CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOEL CARDONA,<br><br>    Defendant and Appellant. | D079256<br><br><br>(Super. Ct. No. SCN389414) |

APPEAL from a judgment of the Superior Court of San Diego County, Brad A. Weinreb, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Christine Levingston Bergman, and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Joel Cardona guilty of second-degree murder as a lesser included offense of first-degree murder.  (Pen. Code, § 187, subd. (a),

count 1.)[1]  The trial court subsequently made true findings on allegations of a prior strike conviction and prior serious felony conviction.  (§§ 1170.12, subds. (a)-(d), 667, subds. (a)(1) & (b)-(i).)  The court declined to strike either of the prior conviction enhancements and sentenced Cardona to 30 years to life, plus five years.

Cardona contends on appeal that:  (1) the trial court violated his constitutional rights by not suspending proceedings under section 1368 to conduct a third competency hearing; (2) the court prejudicially erred in failing to instruct the jury on voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571) and mental impairment (CALCRIM No. 3428); (3) the court prejudicially erred in finding that Cardona waived his *Miranda*[2] rights and admitting his post-arrest statements; and (4) there was insufficient evidence to support the jury's finding of guilt for second-degree murder.

We conclude that the trial court did not abuse its discretion in refraining from suspending proceedings to conduct another competency hearing.  We also conclude that the evidence did not warrant instructing the jury on either imperfect self-defense or mental impairment, and any error in declining to do so was harmless.  We reject Cardona's argument that the trial court prejudicially erred in admitting Cardona's post-arrest statements, because he impliedly waived his *Miranda* rights.  Finally, viewing the evidence in the light most favorable to the jury verdict, we conclude that there is substantial evidence to support the jury's finding that Cardona acted

_____

[1]    Further statutory references are to the Penal Code unless otherwise stated.

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

with implied malice, and that his acts were a substantial factor in causing the victim's death. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*A. N.J.'s Killing*

In August 2018, the victim, N.J., was living with his uncles Rafael J. and Mauricio J. at their house in Oceanside. Cardona, a cousin in the family, went to their house on August 1, 2018. Mauricio had taken Cardona to the hospital earlier that day after he fell and cut his eyebrow, for which doctors gave him stitches and prescribed pain medication. That evening, Cardona spent all night awake watching sports, even though his family members told him to "take [his] meds and go to sleep."

The following morning on August 2, 2018, sometime after 6:00 a.m., Rafael prepared to leave for work in his truck. But Cardona was nervous and tried to keep Rafael from leaving. Rafael asked N.J. to call 911 because Cardona "was not well" and was using foul language to confront Rafael. A responding officer arrived around 6:47 a.m., spoke briefly with Rafael before he left for work, and then talked with Cardona, who was evasive at first. However, after the officer was able to obtain Cardona's information and determine there were no outstanding warrants for his arrest, the officer advised Cardona to avoid further conflict and left the residence around 7:05 a.m.

Less than 15 minutes later, a neighbor, Vanessa Q., called 911 to report that Cardona and N.J. were fighting in the front yard of Rafael's house. Vanessa, while staying on the phone with the 911 dispatcher, walked towards the yard and saw N.J. face down on the ground with his shirt over his face. Cardona was on top of N.J. with one knee on his back, punching N.J. in the head. N.J. pled for help and Vanessa heard N.J. say to Cardona, "You're

3

going to kill me." She also recalled Cardona saying "remember my sister" as he hit N.J. Vanessa told Cardona to stop, but he continued to punch N.J. around his head and face. When Vanessa got closer, Cardona told her to "get back" because "you're ugly." Around that time, Vanessa noticed that N.J. was no longer talking and appeared to be unconscious. She told Cardona, "Stop, you're go[ing to] kill him. Stop it. Please." She then screamed for Cardona to stop, telling him again, "You're killing him[!]" Vanessa's 911 call, which was recorded, lasted approximately ten minutes.

Vanessa testified at trial that Cardona remained on top of N.J. the entire time she observed the incident and hit him "nonstop." She never saw N.J. change positions, hit or kick Cardona, or fight back. She also described how, while N.J.'s shirt was over his face, she could see the shirt moving in and out of his mouth as he was breathing and screaming.

The same officer who came to the residence earlier that morning was the first to respond to the fight. When he arrived at 7:21 a.m., he saw Cardona "smashing" N.J.'s face into the roots of a tree in the yard. The officer drew his firearm and yelled at Cardona, "Let him go or I'm going to fucking shoot you[!]" The officer testified that Cardona looked at him, reached under N.J.'s neck, and pulled it back with "a significant amount of force" in a "snapping-like motion." N.J.'s head then fell forward quickly and hit the ground hard, after which his body went limp. Vanessa also testified that when the officer arrived at the scene, she saw Cardona pull N.J.'s neck and torso back with his left arm before dropping N.J. to the ground, after which N.J. stopped moving.

Cardona then leaned forward towards the officer, who realized that Cardona was unarmed. The officer holstered his firearm and tasered Cardona instead. The officer ordered him to get on the ground, but Cardona

4

still did not comply and instead tried to remove the taser prongs from his body. The officer deployed his taser again, but to no avail. After he was tased three more times, Cardona eventually complied, and the officer proceeded to handcuff him.

The officer turned to N.J., who was not moving or breathing, and attempted to render aid. But while the officer administered CPR, Cardona began kicking the officer in his lower back and trying to kick N.J. in the head. Cardona tried to get up while still handcuffed, so the officer stopped rendering aid to N.J. and restrained Cardona further until other officers arrived at the scene. When they arrived, Cardona was tased two more times because he continued to struggle and attempt to kick N.J.'s head. Cardona was ultimately placed in a full-body harness to restrain his movement, N.J. was declared dead at the scene.

A field evidence technician processed the crime scene and noted that the dining room inside the house was in disarray. Chairs and the trash can were knocked over, the television was lying on the living room floor, and the technician found blood drops on the kitchen floor. Testing showed that the blood came from N.J. and not Cardona.

N.J.'s uncles testified that N.J. had been living at their house for years, and they never saw Cardona and N.J. argue, nor were they aware of any problems between the two. Rafael also testified that Cardona's behavior that morning was strange and out of character, but N.J. was acting normal and sitting on his bed resting when Rafael asked him to call the police.

*B. Cardona's Post-Arrest Interrogation*

Two detectives attempted to speak with Cardona on the day of the incident after he was taken to a hospital for treatment, but he had trouble staying awake due to sedatives he was given. Instead, the detectives

questioned Cardona in jail the following day on August 3, 2018. At that time, Cardona appeared alert, engaged, and interested in speaking with them. One detective advised Cardona of his *Miranda* rights, and Cardona verbally confirmed that he understood them. The detectives did not expressly ask Cardona if he was willing to waive his rights and speak to them, but Cardona proceeded to answer questions about the previous day's events.

Cardona told the detectives that after Mauricio took him to the hospital to get stitches for his eyebrow, he went back to his cousins' house and stayed up all night watching sports. The following morning, he went outside and tried to keep his cousin Rafael from going to work because he was feeling paranoid and was afraid of being alone at the house.

After he spoke with the officer who was dispatched to the house, Cardona went inside and saw N.J. in the kitchen. Cardona said that N.J. made a comment about the oven being his, which angered Cardona because the house belonged to N.J.'s uncles, and he thought N.J. was being disrespectful. Cardona punched N.J. in the mouth, N.J. responded by pushing Cardona in the chest, and the two brawled inside before eventually moving to the front yard.

When they were fighting outside, Cardona remembered that he had seen N.J. wearing sunglasses that Cardona thought were his, and it made him angry that N.J. may have stolen the sunglasses from Cardona's sister's car. Cardona said he asked N.J. where his sunglasses were while he was hitting him, and that he had his knee on N.J.'s back. When N.J. did not answer, Cardona continued to punch him. Cardona told detectives that he only hit N.J. a few times, and that he stayed on top of him because ". . . I didn't know if [N.J.] was going to grab me and like try to take advantage of me to where I was in a position to defend myself." Cardona did not recall

6

N.J. telling him to stop or telling him that he was killing him, and Cardona said ". . . I would've stopped if, if I knew that was the—that's what he was saying." Cardona said that he did not intend to kill N.J., and that he did not remember hitting N.J.'s head against tree roots in the front yard. However, Cardona did recall N.J. yelling for him to get back, and he remembered Vanessa coming over to say, "stop, you're killing him."

When asked why he would react so strongly to N.J. saying the oven was his, or N.J. taking his sunglasses, Cardona said, "Probably because I spent the whole night up" and "I don't know." According to Cardona, he had a good relationship with N.J., and they had never fought before or had any issues in the past. When asked whether he could have walked away from the altercation after N.J. was face down and Cardona had the position of advantage, he agreed that he could have chosen to get off N.J.—but he continued to hit N.J. because he was "waiting for an answer" regarding his sunglasses. Cardona made no mention of N.J. threatening him or using a weapon against him.

### C. Medical Examiner's Testimony

A medical examiner testified regarding her inspection of N.J.'s body. She observed bruising and abrasions on his face, neck, chest, abdomen, and back. She found lacerations on his scalp and small hemorrhages on his eyelids, which could be consistent with strangulation or a violent cough. There were also tears and bleeding inside N.J.'s mouth.

As for internal injuries, there was bleeding under N.J.'s scalp on the front, sides, and back of his head, with a small subdural hemorrhage along the base of his brain. Those internal injuries were hallmarks of force applied to the brain, and Cardona's external injuries were also consistent with him being punched in the head and face repeatedly. There were hemorrhages on

7

both sides of N.J.'s neck, which were consistent with being held in a chokehold for several minutes and being yanked backwards by the neck. Injuries on N.J.'s torso and back were also consistent with him being pinned face down to the ground with someone sitting on his back.

A toxicology test detected the presence of methamphetamine in N.J.'s blood at 0.92 milligrams per liter, a concentration slightly below the average level of fatal overdoses seen in the medical examiner's office. The medical examiner concluded that the cause of death was "head and neck trauma with methamphetamine toxicity contributing," and that the manner of death was homicide. Multiple factors could have played a role in N.J.'s death, including blunt force trauma to N.J.'s head, strangulation from having an arm around his neck, suffocation from his shirt against his nose and mouth, mechanical asphyxia from someone sitting on his back, and the effects of methamphetamine in his system. However, there was no way to single out any of the factors as the cause of death. While the level of methamphetamine in N.J.'s blood could have caused an overdose or increased his risk of fatal cardiac arrest, N.J. also could have survived if not for his other injuries.

*D. Toxicologists' Testimony*

The defense called Dr. Charles O'Connell, a medical toxicologist, as an expert witness. In his opinion, N.J.'s individual injuries were not independently fatal. The 0.92 milligrams per liter concentration of methamphetamine found in N.J.'s blood was "relatively high" and within overdose range, but sometimes the concentration of methamphetamine detected after death is higher than pre-mortem levels. Inexperienced users could have a more extreme response to methamphetamine than more frequent users, who have a higher tolerance. Such responses could include cardiac arrest or arrhythmias, which would be exacerbated by a physical

altercation or having another person's weight on top of them. When asked whether it was possible for someone like N.J. to survive his injuries from the fight with Cardona, absent methamphetamine, Dr. O'Connell said it was possible. He also said that a person "being . . . choked [while] their head is being . . . hit into the ground . . . is potentially fatal if it goes on long enough."

The People called Dr. Ola Bawardi, a forensic toxicologist, as a rebuttal expert witness. She testified that physical symptoms of methamphetamine use include hyperactivity, rapid speech, and fidgeting. While the concentration of methamphetamine in N.J.'s blood was high, post-mortem redistribution of methamphetamine can cause a "false elevation of the level of methamphetamine that a person would have had at the time of death[.]" Given his detected blood concentration level, Dr. Bawardi believed that N.J. had used methamphetamine within 12 hours of his death.

### E. 911 Dispatcher Testimony

The People called as a rebuttal witness the 911 dispatcher who took N.J.'s call when Cardona was preventing Rafael from leaving for work. After the People played the call recording, which lasted approximately five minutes, the dispatcher testified that N.J. seemed "very calm [and] forthcoming answering questions in a cohesive manner." She described N.J.'s demeanor on the call as "calm" and "factual."

### F. Verdict and Sentencing

The People charged Cardona with murder and alleged a serious felony prior and a strike prior. (§ 187, subd. (a), count 1; §§ 1170.12, subds. (a)-(d), 667, subds. (a)(1) & (b)-(i)).

After the jury began deliberating, it requested a readback of the testimony from the responding officer and one of the detectives who interrogated Cardona. The jury also asked for clarification of CALCRIM

9

No. 520, the instruction on first- or second-degree murder with malice aforethought, and more specifically, the meaning of "at the time he acted, he knew his act was dangerous to human life." The jury's note said that "some of us interpret that as affecting life such as harmed, disabled, or marred[/]crippled" and "others interpret [that] as causing death or taking a human life. Any further clarification that you can offer on this element of first/second degree murder would be appreciated." After hearing from the parties, the court responded to the jury with the following: "The risk of serious bodily injury alone is not sufficient. There must be awareness of the risk of death from the defendant's actions."

The jury subsequently found Cardona guilty of second-degree murder as a lesser included offense of first-degree murder. (§ 187, subd. (a), count 1.) After Cardona waived his right to have the jury decide the prior conviction allegations, the trial court made true findings on the allegations of a prior strike conviction and prior serious felony conviction. (§§ 1170.12, subds. (a)-(d), 667, subds. (a)(1) & (b)-(i).) In June 2021, the trial court declined to strike either of the prior conviction enhancements and sentenced Cardona to 30 years to life plus five years.

DISCUSSION

I

Cardona first contends that the trial court had an obligation to suspend proceedings under section 1368[3] to conduct another competency hearing,

---

3    Section 1368 provides, in relevant part:

10

even though two different psychiatrists had already conducted pretrial evaluations within the year before trial and found him competent. We conclude that the trial court did not abuse its discretion in refraining from suspending proceedings because the record does not show that circumstances had substantially changed in a manner casting doubt on the validity of the two prior competency findings.

We begin first with additional background information relevant to this issue before setting forth the governing legal principles and explaining our conclusion.

### A. Additional Relevant Facts

In January 2019, a year before Cardona's trial commenced, the court suspended proceedings pursuant to section 1368 so that he could undergo a

---

"(a) If, during the pendency of an action and prior to judgment . . . a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . . At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time.

"(b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court.

"(c) Except as provided in Section 1368.1, when an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined."

11

competency examination.  In March 2019, a psychiatrist determined that Cardona was competent to stand trial after interviewing him in custody and reviewing his case records.  The psychiatrist noted that Cardona had a self-reported history of schizoaffective disorder.  Cardona also told the psychiatrist that he was not taking any mental health medications at the time of the interview but had received treatment at a hospital and taken medications in the past.  The psychiatrist observed that Cardona "did not want to sit down for the interview and wanted to stand," that he did not always answer questions directly, and that he would "ramble at times." However, the psychiatrist also observed that Cardona had no active symptoms of schizoaffective disorder and concluded that Cardona had "the ability to understand the nature of the proceedings against him[]" and "cooperate with his attorney in a rational manner in his own defense."

In June 2019, the court suspended proceedings again pursuant to section 1368 because Cardona's attorney declared doubts about his competency.  A different psychiatrist evaluated Cardona, and in July 2019 he also found Cardona competent to stand trial.  The psychiatrist noted that during the interview, Cardona "fluctuated in his cooperation" with answering questions, but "was oriented and did not display any psychotic symptoms . . ." Cardona "showed difficulty with remaining focused" and "frequently changed the subject of questions asked," going on "short tangents questioning his own willingness to cooperate with the evaluation, before eventually deciding to continue."  Cardona again reported being hospitalized and diagnosed with schizoaffective disorder in the past.  However, Cardona said he was not under the care of a jail psychiatrist at the time of the interview and was not taking any psychiatric medications because they "weigh him down."  The psychiatrist concluded, as the previous psychiatrist had, that despite

12

Cardona's deficits in focus and intellectual functioning, he had "no diagnosable severe mental illness" and "appear[ed] capable of assisting his attorney in a rational defense[.]"

Proceedings were reinstated and pretrial motions were heard in early January 2020.  During that hearing, the trial court noted that it had spoken with Cardona about appropriate courtroom behavior and found that restraints were not necessary at that time.  The court thanked Cardona for being respectful of the process that morning, and the following exchange ensued:

> "[CARDONA]:  Go into your afternoon.
> "THE COURT:  I'm sorry?
> "[CARDONA]:  Into your late afternoon, into your late evening, into your night.
> "THE COURT:  Thank you.  The court is aware–
> "[CARDONA]:  Can I address the court?
> "THE COURT:  One second, please.  The court – the court's aware of the legal evidentiary requirements that [the] court must engage in prior to engaging in restraints.  There's nothing before me that would suggest the need to do [so] now.  If an issue comes to the court's attention that we need to address, we'll do so at the appropriate time."

Early on the first day of trial on January 7, 2020, the following exchange occurred outside the presence of the jury:

> "THE COURT:  . . . I want to caution you, you've stood up a couple of times today and yesterday.  It makes my bailiff nervous when you do so and when it's happening as a surprise.  [¶]  And so–
> "[CARDONA]: Okay.  Okay.  I apologize.  I won't–
> "THE COURT:  And I–
> "[CARDONA]:  Do my best to refrain from that.  Thank you so much.
> "THE COURT:  I appreciate that.  It's – It's also for your safety as well.  So–
> "[CARDONA]:  I understand.  Like, I already know the repercussions.  Like–

13

"THE COURT:  That's fine.
"[CARDONA]:  All, like, duration of time.
"THE COURT:  I appreciate that.  We're here for a long time, and sometimes we all need to stand up and stretch, and sometimes we need to take breaks.  [¶]  If you need to take a break other than when we have the scheduled breaks, you let your attorney know. . . .  But in terms of you interacting with the jurors, interacting with members of the public or family members that may be in the courtroom, I'm going to ask you not to do so.
"[CARDONA]:  Okay."

Soon thereafter, before opening statements, the court admonished Cardona that if necessary, the court would consider using a chair with restraints to prevent him from standing up.

Later that afternoon, the court noted that Cardona had stood up "several times" and that Cardona reached forward and grabbed his name plate twice.  Cardona, talking over the court at times, said, "You have to excuse me . . . I was in college, you know, I got a lot of racing thoughts and stuff like that . . . You know, I don't mean any harm . . . I don't even recall, like, what's going on[.] . . .  I'm not a mess-up.  I'm not a fuck up."  The court stated that reaching for the name plate caused security concerns, so the name plate was removed from the table.  The court also noted that Cardona was "becoming frustrated with this process[,]" and that the court had given Cardona the opportunity to speak with his attorney.  This exchange then ensued:

"[CARDONA]:  You can excuse my language, you know.
"THE COURT:  You – You've been respectful of the process, but you have not been conforming with some of the things that I've asked you to do.  [¶]  I don't want you standing up anymore during the trial.
"[CARDONA]:  That's fine.  That's fine.
"THE COURT:  And we may have – If you're not able to conform with my rulings, we may have to take additional

14

measures such as securing you to the chair. But I'm going to give your attorney the opportunity to talk to you–
"[CARDONA]: Put me back in the cell. He'll [defense counsel] fight my case."

After Cardona stood again before a witness took the stand, the court recessed for Cardona to speak with his attorney about potentially being restrained. After the recess, Cardona's attorney objected to using a restraint chair because of how the jury would perceive it. The court noted that the jury would not be able to see that he was being restrained, the chair would still allow him to have free movement of his upper body, and it would not infringe on his ability to assist his counsel. As the court was making these statements, Cardona asked, "What if it had suicide doors?" He and the court then engaged in cross-talk, during which Cardona said, "I was abiding by the laws enacted, you know, like, in 2017, '18, '19. So . . . I have nothing to say." The court admonished Cardona not to speak while it made its ruling.

The court's bailiff then spoke on the record about Cardona's repeated non-compliance with instructions to remain seated, as well as about jail records indicating he "hasn't been compliant with his medication[.]" After hearing those comments, the court found that there was a need for Cardona to use the restraint chair for security reasons. The court also stated that it did not "have any issues or concerns with respect to [section] 1368 or competency issues[]" and it believed Cardona was being impacted by the "emotional nature of . . . the case." The court admonished Cardona that if he continued to be disruptive, it could remove him from the courtroom, or Cardona could choose not to participate in the proceedings.

When trial adjourned for the day and the attorneys were addressing the admissibility of Cardona's post-arrest statements, Cardona interrupted twice: once to mention "1982," and once to ask, "Are we having pizza[?]" At

15

his attorney's request, the court made "another referral to jail medical to evaluate and address" Cardona's "medication issues[.]"

The second day of trial proceeded without incident, but on the third day, Cardona interjected a few times while the attorneys discussed jury instructions with the court. At one point he asked, "You guys seen that movie Marshal?" As the discussion progressed, Cardona asked to leave and said, "I have small claims court handles the outside . . . of this case. . . . Took three years." After being given the opportunity to speak with his attorney, Cardona decided to waive his presence during the parties' discussion of jury instructions, and his attorney proceeded in his absence.

Cardona was present for the fourth day of trial and interjected with brief comments during the defense's expert testimony, which led the court to admonish him again. After a recess, defense counsel informed the court that Cardona wanted to waive his presence again and listen to proceedings from a holding cell until closing arguments. The court agreed to instruct the jurors that Cardona had exercised his right not to be present, and that they should not speculate as to the reasons why. At some point during subsequent witness testimony, a pounding noise could be heard in the courtroom coming from Cardona's holding cell.

After testimony concluded on the fourth day, but before jury instructions and closing arguments, Cardona returned to the courtroom and the court advised him that if he began disrupting the proceedings, the court would "have to take a break and address that." The rest of the day proceeded without incident, and on the fifth and final day of trial, Cardona waived his right to have the jury decide the prior conviction allegations.

When the jury reached a verdict two days later, Cardona was initially unwilling to come out of his cell for the reading of the verdict. After

16

consulting with his counsel, Cardona agreed to appear in court. However, after the verdict was read and while the court was providing final instructions to the jury, Cardona interrupted the proceedings and attempted to get up from his chair. Cardona was not compliant with deputies' commands, so the jury was ordered to leave the courtroom briefly while the deputies removed him.

*B. Governing Law*

"The constitutional guarantee of due process forbids a court from trying or convicting a criminal defendant who is mentally incompetent to stand trial. [Citations.] Section 1367 of the Penal Code, incorporating the applicable constitutional standard, specifies that a person is incompetent to stand trial 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' " (*People v. Rodas* (2018) 6 Cal.5th 219, 230 (*Rodas*); *People v. Buenrostro* (2018) 6 Cal.5th 367, 386 ["As a matter of due process, '[a] defendant may not be put to trial unless he " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him.' " ' "].)

Section 1368 provides for the suspension of criminal proceedings to conduct a competency hearing if a doubt arises as to the defendant's mental competence to stand trial. (See *People v. Lawley* (2002) 27 Cal.4th 102, 136 (*Lawley*).) Our Supreme Court "has construed that provision, in conformity with the requirements of federal constitutional law, as meaning that an accused has the right 'to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of

17

understanding the nature of the proceedings against him or of assisting in his defense.' " (*Rodas*, *supra*, 6 Cal.5th at p. 231.) "When a doubt exists as to the defendant's mental competence, the court must appoint an expert or experts to examine the defendant. The issue is then tried to the court or a jury under the procedures set out in Penal Code section 1369." (*Ibid.*)

However, a defendant is presumed competent unless proven otherwise by a preponderance of the evidence (§ 1369, subd. (f)), and "a defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his [or her] defense counsel" (*People v. Ramos* (2004) 34 Cal.4th 494, 508 (*Ramos*)) before the trial court is obligated to order a competency hearing. Evidence " 'that does no more than form the basis for speculation regarding possible current incompetence is not sufficient.' [Citations.]" (*People v. Ramirez* (2006) 39 Cal.4th 398, 431 (*Ramirez*).)

Moreover, " '[w]hen a competency hearing has already been held and defendant has been found competent to stand trial, . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it "is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 542.) A trial court may rely on its own observations in determining whether the defendant's mental state has significantly changed during the course of trial to necessitate a new competency hearing. (*People v. Jones* (1991) 53 Cal.3d 1115, 1153.)

"We review a trial court's determination concerning whether a new competency hearing must be held for substantial evidence." (*People v. Ng* (2022) 13 Cal.5th 448, 531.)

*C. Analysis*

Cardona primarily asserts that his actions and comments during the pretrial motion hearing and throughout trial showed that between the competency findings in March and July 2019, and his trial in January 2020, Cardona was "showing mental decompensation" because he "was not taking his medication." According to Cordona, this constituted "evidence casting doubt on the initial competency findings."

Importantly, however, the evidence shows Cardona was *not taking medication* at the time of his prior competency evaluations. During his interview for the March 2019 competency report, Cardona said that although he had received treatment at a hospital and taken medications in the past, he was not taking any mental health medications at that time. In July 2019, Cardona again reported that he was not under the care of a jail psychiatrist and was not taking any psychiatric medications because they "weigh him down." Given that Cardona was not taking medication at either time when two different psychiatrists deemed him competent, the fact that he was not taking medication shortly before or during trial was not a change of circumstances that would warrant suspending the proceedings yet again.

Nor did Cardona's behavior in court constitute substantial evidence of materially changed circumstances casting doubt on the validity of the prior findings of competence. Although Cardona frequently stood during trial despite the court's orders to remain seated, the first evaluating psychiatrist observed that Cardona "did not want to sit down for the interview and wanted to stand for the interview." That same psychiatrist also noted that Cardona sometimes had to be asked the same questions repeatedly, and that Cardona would "ramble at times[.]" The second psychiatrist similarly reported that Cardona "fluctuated in his cooperation" with answering

19

questions, "showed difficulty with remaining focused[,]" and "frequently changed the subject of questions asked," going on "short tangents questioning his own willingness to cooperate with the evaluation, before eventually deciding to continue."

These observations are largely consistent with Cardona's comments and outbursts during trial, which lends further support to the trial court's decision that another competency hearing was not necessary. (See *Lawley*, *supra*, 27 Cal.4th at pp. 136–138 [each instance cited by defendant as an example of his incompetence "appears . . . to manifest the same arguably delusional beliefs" reported by the two evaluating psychologists who found defendant competent].) "[T]he duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*Rodas*, *supra*, 6 Cal.5th at pp. 234–235.) Here, because Cardona's behavior in court was similar to his behavior during prior competency evaluations, the record does not show any substantial change of circumstances or new evidence casting doubt on the prior findings of competency. (*Lawley*, at pp. 137–138.)

Furthermore, occasional bizarre behavior and "strange words," by themselves, shed little light on the question of whether the defendant can assist in his own defense. (See *Ramos*, *supra*, 34 Cal.4th at p. 508.) Unlike in *People v. Easter* (2019) 34 Cal.App.5th 226, which Cardona cites to in his briefs, there was no indication here that Cardona's communications with his attorney were compromised to the extent that they "consisted of jumbled words and fanciful responses," making it impossible for him to "hold a logical

20

conversation, consult with [his attorney] with a rational degree of understanding, or assist in his own defense or testify at trial." (See *id.* at p. 243.) Although his attorney requested that Cardona be evaluated to address "medication issues," his counsel never reported having significant trouble communicating or consulting with Cardona during trial.

Rather, the trial record shows that on multiple occasions, Cardona appeared able and willing to consult with his attorney during instances when the court confronted him about his disruptive behavior, when he decided to waive his presence, and when he waived his right to a jury trial on the prior conviction allegations. More than once, Cardona even apologized to the court for disrupting proceedings and said he would do his "best to refrain from that."

The two evaluating psychiatrists for the pretrial competency proceedings also concluded that despite Cardona's tendency to ramble, go on tangents, and change the subject of questions, he still had "the ability to understand the nature of the proceedings against him[,]" could "cooperate with his attorney in a rational manner in his own defense[,]" and "appear[ed] capable of assisting his attorney in a rational defense[.]" The psychiatrists observed that Cardona had no active symptoms of schizoaffective disorder, no psychotic symptoms, and "no diagnosable severe mental illness."

We must accord great deference to a trial court's decision not to order a competency hearing, because the trial court is uniquely situated to observe the defendant's conduct and demeanor and relative ability to understand the nature of the proceedings and rationally conduct a defense. (*People v. Danielson* (1992) 3 Cal.4th 691, 726–727.) And while Cardona's behavior provided some basis for speculating about a possible mental disorder or developmental disability, speculation is an insufficient basis for requiring the

21

suspension of proceedings for a third time. (*Ramirez*, *supra*, 39 Cal.4th at p. 431.) We therefore conclude that the trial judge—who was aware Cardona had been found competent on two prior occasions within the year before trial, and who was able to observe his conduct at trial as a whole and in context— did not err by declining to sua sponte order a third competency hearing.

## II

We turn next to Cardona's arguments that the trial court prejudicially erred in failing to instruct the jury on (1) voluntary manslaughter based on imperfect self-defense, and (2) mental impairment as a defense to specific intent. We conclude that the trial court did not err in declining to give these instructions because substantial evidence did not support instructing the jury on either of them. We further conclude that even if the court did err in declining to give either of these instructions, any error was harmless.

*A. Governing Law*

Voluntary manslaughter based on imperfect self-defense is a lesser included offense of murder. The trial court has a duty to instruct on this theory "whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense." (*People v. Barton* (1995) 12 Cal.4th 186, 201 (*Barton*).)

A trial court has no sua sponte duty to instruct on mental impairment as a defense to a specific mental state. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) If requested by the defense, however, the trial court must give a pinpoint instruction on mental impairment if there is evidence supportive of the theory. (*Ibid*.)

A trial judge "has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence." (*People v.*

22

*Ponce* (1996) 44 Cal.App.4th 1380, 1386.)  Even requested instructions need not be given to the jury "absent substantial evidence to support them." (*People v. Stitely* (2005) 35 Cal.4th 514, 551); accord, *People v. Nguyen* (2015) 61 Cal.4th 1015, 1049 (*Nguyen*).)  On review, we determine independently whether substantial evidence to support a requested instruction existed.  (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055; see *People v. Mentch* (2008) 45 Cal.4th 274, 288 ["On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence—evidence that, if believed by a rational jury, would have raised a reasonable doubt . . . ."].)

### B. Jury Instruction on Imperfect Self-Defense

At trial, the defense requested that the court instruct the jury on voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571).  The People objected, arguing that under the bracketed portions of the instruction, imperfect self-defense "does not apply when the defendant, through [his] own wrongful conduct, has created circumstances that justify [his] adversary's use of force."  (CALCRIM No. 571.)  The People also argued that Cardona never expressed fear of N.J. or concern for his own safety, aside from telling detectives that he wanted to prevent N.J. from taking advantage of him in the fight.  The court initially sided with the defense, but after further consideration, the court agreed with the People that the instruction was unwarranted because the evidence was not sufficient to show that Cardona believed he was in danger of imminent harm or great bodily injury.

There are two types of self-defense under California law:  "perfect" self-defense and "imperfect" self-defense.  (*People v. Randle* (2005) 35 Cal.4th 987, 994.)  "For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great

23

bodily injury." (*Ibid.*)  Imperfect self-defense requires evidence showing the " 'defendant killed another person because the defendant *actually*, but *unreasonably*, believed he was in imminent danger of death or great bodily injury . . . .' " (*Nguyen*, *supra*, 61 Cal.4th at p. 1048, italics added.)  In contrast to perfect self-defense, imperfect self-defense is not a true affirmative defense; it is shorthand for a theory of voluntary manslaughter. (*Barton*, *supra*, 12 Cal.4th at pp. 199–201.)

For imperfect self-defense to apply, "the fear must be of imminent harm." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  A fear of future harm will not suffice no matter how great the fear and likelihood of harm. (*People v. Landry* (2016) 2 Cal.5th 52, 97–98; *People v. Manriquez* (2005) 37 Cal.4th 547, 581–582.)  Furthermore, imperfect self-defense cannot be used by a defendant whose wrongful conduct creates circumstances under which the victim's actions are legally justified.  (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 (*Christian S.*).)

Here, we conclude that the imperfect self-defense instruction was unwarranted because the evidence did not show Cardona actually believed, reasonably or unreasonably, that he was in imminent danger of death or great bodily injury.  In his interrogation, Cardona told detectives that he stayed on top of N.J. with his knee against his back because ". . . *I didn't know* if [N.J.] was going to grab me and like try to take advantage of me to where I was in a position to defend myself." (Italics added.)  When asked whether he could have walked away from the altercation after N.J. was face down and Cardona had the position of advantage, he agreed that he could have chosen to get off N.J.—but he continued to hit N.J. because he was "waiting for an answer" regarding his sunglasses.  Cardona also explained that when he was on top of N.J. while N.J. was face down on the ground, he

24

"just wanted to get in that position to where he wasn't trying to like . . . hurt [him]." This statement establishes that Cardona kept his knee on N.J.'s back only to maintain the upper hand while he was attacking N.J. Cardona's statements do not establish that his aggressive acts were in response to any actual belief that he needed to defend himself from danger of death or great bodily injury.

Furthermore, there is no evidence that Cardona had reason to fear N.J. based on their prior interactions. According to Cardona, he had a good relationship with N.J., and they had never fought before or had any issues in the past. Other family members testified that they had never seen the two argue and they were not aware of any problems between them. Cardona also made no mention of N.J. threatening him or using a weapon against him either before or during the incident.

Even if Cardona did actually believe N.J. was a threat or posed some kind of danger, there is no evidence he believed that danger was *imminent*. Imperfect self-defense only applies when the defendant fears immediate harm that " '*must be instantly dealt with.*' [Citation.]" (*People v. Beck and Cruz* (2019) 8 Cal. 5th 548, 648, internal quotation marks omitted.) Here, the only harm Cardona mentioned was the *possibility* that N.J. might fight back against him, but there is no indication he believed such potential danger was imminent. Cardona had his knee on N.J.'s back while N.J. was lying prone on the ground, and Vanessa testified that for the entire time she was watching them, N.J. never changed positions, never hit or kicked Cardona, and never fought back.

The fact that Cardona was the instigator of the fight also supports the trial court's finding that there was no basis for an imperfect self-defense instruction. (See *Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.) As the

People noted at trial, imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force. (*Ibid*.) Here, Cardona admitted after his arrest that the brawl started when he punched N.J. in the mouth. Cardona said that N.J. then pushed him back and they "were struggling in the house," but once they got outside, there was a point at which N.J. no longer fought back. The record shows that Cardona instigated and continued the physical confrontation that led to N.J.'s death, which supports the trial court's decision not to give the imperfect self-defense instruction.

Cardona argues that because the court gave the instruction on perfect self-defense, there must have been a basis for the jury to find he acted in imperfect self-defense. But "just because the court permitted instructions on perfect self-defense does not mean that substantial evidence supported the giving of an imperfect self-defense instruction." (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1270.) Given the evidence in this case, we conclude that "it would not have been error for the trial court to have denied perfect self-defense instructions with regard to [the victim] because no substantial evidence supported such a defense." (*Ibid*.)

Even assuming the trial court erred by not giving an imperfect self-defense instruction, the record does not show that the error was prejudicial. The failure to instruct on imperfect self-defense constitutes reversible error only if the defendant establishes that it is reasonably probable he would have obtained a more favorable outcome had the error not occurred. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 191, 197–199, 200, fn. 4 (*Gonzalez*) ["... we have since clarified that *Watson* applies to the failure to instruct on lesser included offenses."]; see *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) In applying this harmless error analysis, a court must be mindful

that the failure to provide the jury with the option of convicting on voluntary manslaughter "creates a specific kind of risk—that the jury, faced with an all-or-nothing choice between first degree murder or acquittal" will convict the defendant of murder even though the prosecution failed to satisfy its burden to prove the crime.  (*Gonzalez*, at pp. 191, 200.)

The question, however, "is not what a jury *could* have done, but what a jury would *likely* have done if properly instructed."  (*People v. Reeves* (2001) 91 Cal.App.4th 14, 53; see *People v. Breverman* (1998) 19 Cal.4th 142, 177, 178.).)  " 'In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citation.]" (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1432.)  We also consider the instructions as a whole, the jury's findings, and the closing arguments of counsel.  (*People v. Cain* (1995) 10 Cal.4th 1, 35–36; *People v. Eid* (2010) 187 Cal.App.4th 859, 883.)

Here, for the reasons we have discussed, it would have been a stretch for any reasonable juror to conclude that Cardona genuinely believed he was in imminent danger of death or great bodily injury when he had his victim restrained face down on the ground and was beating him mercilessly simply for not answering his questions.  The fact that Cardona was the instigator of the fight also made it unlikely the jury would find he acted with a belief in the need for self-defense.  Cardona points to the fact that the jury asked for a readback of the two law enforcement officers' testimony and for clarification of the instruction on murder to argue that it is reasonably probable he would have obtained a more favorable outcome if the jury was instructed on

27

imperfect self-defense. However, the readback covered a wide range of topics, including all of the responding officer's interactions with Cardona that morning and Cardona's post-arrest statements, and there is no indication the jury's request was specifically related to the issue of self-defense. Furthermore, the jury's question about CALCRIM No. 520 focused on the meaning of "dangerous to human life" for purposes of determining whether he acted with implied malice, not whether he acted in self-defense.

Finally, the jury in this case was not faced with an "all-or-nothing choice between first degree murder or acquittal"—rather, the court instructed the jury on second-degree murder, perfect self-defense, voluntary manslaughter based on heat of passion, and involuntary manslaughter. (See *Gonzalez*, *supra*, 5 Cal.5th at pp. 191, 200.) On the topic of self-defense, Cardona's counsel argued in closing that N.J. actually instigated the fight by "start[ing] an argument over a stove[,]" perhaps because he was under the influence of methamphetamine. He also argued that N.J. may have threatened Cardona with a frying pan or with a broken chair leg. Later in his closing, Cardona's counsel repeated these points to argue for finding that Cardona was provoked for heat-of-passion purposes. But in finding Cardona guilty of second-degree murder, the jury appears to have rejected those attempts to argue that Cardona was not the instigator, making it even more improbable that the jury would have found Cardona acted in imperfect self-defense. For all these reasons, we conclude that any error from declining to instruct the jury on imperfect self-defense was harmless under *Watson*.

*C. Jury Instruction on Mental Impairment*

Cardona's counsel also requested that the court instruct the jury on mental impairment to negate the specific intent element of the charged

28

offense (CALCRIM No. 3428).[4]  At trial, the People argued that the instruction was inappropriate because the evidence did not establish that Cardona suffers from a mental disease, defect, or disorder.  In response, the defense pointed to evidence indicating that Cardona was acting oddly and not taking "his meds" at the time of the incident.

The court stated that the evidence did not establish whether or when Cardona was off medication, and even if it had, it was unclear what that medication was for.  The court ultimately denied the defense's request for the instruction on the basis that the evidence presented was insufficient to show that Cardona suffered from a mental disease or disorder.

CALCRIM No. 3428 "is a pinpoint instruction that must be given only if requested by the defendant, and only if substantial evidence supports the defense theory that defendant's mental disease or disorder affected the formation of the relevant intent or mental state.  [Citation.]  Also, expert medical opinion testimony is necessary to establish that a defendant suffered from a mental disease, mental defect, or mental disorder within the meaning of CALCRIM No. 3428, because jurors cannot make such a determination from common experience."  (*People v. Larsen* (2012) 205 Cal.App.4th 810, 824 (*Larsen*); see also *People v. Moore* (2002) 96 Cal.App.4th 1105, 1117 ["Expert medical testimony is necessary to establish a defendant suffered from a mental disease, mental defect, or mental disorder because jurors cannot make such a determination from common experience"].)

---

4    CALCRIM No. 3428 instructs, in relevant part, as follows:  "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder).  You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime."

Here, Cardona introduced no expert testimony regarding any mental defect or disorder, and he failed to introduce any other evidence that he suffered from a specific mental disorder or impairment at the time of the offense. As the trial court noted, the record does not establish what kind of medication, if any, he was taking when the fight occurred. Cardona received treatment for a cut above his eye the day before the incident, but the record indicates he was prescribed pain medication, not medication to treat a mental disease or disorder. Although Cardona reported during his interrogation that he had previously been diagnosed with schizoaffective disorder, that evidence was not presented to the jury and there was no evidence confirming that diagnosis, let alone showing whether Cardona was suffering from symptoms of schizoaffective disorder at the time of the crime. Given this record, we conclude that the trial court did not err in finding that no substantial evidence supported instructing the jury on mental impairment.

Even assuming error, the record does not show that declining to give the mental impairment instruction was prejudicial. Prejudice resulting from the failure to give a pinpoint instruction is assessed under the state constitutional standard requiring reversal only if it is reasonably probable the jury would have reached a different result if the omitted instruction had been given. (*Larsen, supra*, 205 Cal.App.4th at p. 829; see *Watson, supra*, 46 Cal.2d at p. 836.) Here, even if the jury received the instruction on mental impairment, the jury would have had no evidence to rely on in considering whether a mental disease or defect prevented Cardona from acting with the intent required for murder. The defense failed to present sufficient evidence of a mental disease or defect, and also failed to connect any of Cardona's supposed symptoms with the evidence of his intent. (See *Larsen*, at p. 833 [failure to instruct on mental impairment was harmless where "the

30

connection between the symptoms of defendant's Asperger's syndrome and the evidence of intent to commit the charged conspiracy was not at all persuasive, and the evidence of guilt was compelling."].) In contrast, as discussed below, the evidence that Cardona acted with the implied malice required for second-degree murder was substantial. Accordingly, it is not reasonably probable that the jury in this case would have reached a different result if CALCRIM No. 3428 had been given.

## III

Cardona next argues that the trial court erred in finding that he waived his *Miranda* rights during his interrogation and admitting his post-arrest statements at trial. We conclude that the trial court did not err because even though there was no express waiver, Cardona impliedly waived his *Miranda* rights, and any potential error was harmless beyond a reasonable doubt.

### A. Additional Relevant Facts

At the beginning of his custodial interrogation, one of the two interrogating detectives informed Cardona of his *Miranda* rights and Cardona confirmed he understood them. The detective did not ask Cardona a follow-up question to confirm his waiver of those rights before proceeding with questioning. According to the detective, however, Cardona was willing to speak with him and answered his questions fully. Before the interrogation, Cardona's sister told the detective that Cardona had a mental illness and was taking psychiatric medication, but the detective did not know the severity of Cardona's mental illness and it appeared to him that Cardona understood what was happening during the questioning.

At trial, the defense sought to exclude Cardona's statements on *Miranda* grounds. The court reviewed the transcript, video, and audio

31

recordings from Cardona's post-arrest interview. The court also heard testimony from one of the interrogating detectives. After hearing arguments from the parties, the court found that the detective properly advised Cardona of his *Miranda* rights, and that Cardona impliedly waived those rights by willingly subjecting himself to questioning. The court determined that the detectives did not use coercive physical or psychological tactics, and that even though Cardona has mental impairments, they were not so severe as to make his statements unreliable or overcome his ability to voluntarily and implicitly waive his *Miranda* rights. Accordingly, the court denied the defense's request to exclude Cardona's interrogation statements.

### B. Governing Law

"In general, if a custodial suspect, having heard and understood a full explanation of his . . . *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he . . . has thereby knowingly, voluntarily, and intelligently waived them. [Citation.] Law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview. [Citation.] Rather, a valid waiver of *Miranda* rights may, as here, be inferred from the defendant's words and actions. [Citation.]" (*People v. Cunningham* (2015) 61 Cal.4th 609, 642 (*Cunningham*).)

Whether a statement is voluntary depends on "whether the statement is ' "the product of an essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion. [Citation.] No single factor is dispositive; 'rather courts consider the totality of [the] circumstances.' [Citations.]" (*Cunningham, supra*, 61 Cal.4th at p. 642.) Relevant considerations include the level of coercion, the length and location of the

32

interrogation, its continuity, and the defendant's maturity, education, and physical and mental health. (*Id.* at pp. 642–643.)

" 'On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*.' [Citation.]" (*People v. Hensley* (2014) 59 Cal.4th 788, 809.)

*C. Analysis*

We conclude that the totality of the circumstances of Cardona's interrogation support that he waived his *Miranda* rights knowingly and voluntarily. After the detective informed him of his rights, Cardona confirmed that he understood them and continued to talk to the detectives. Neither the length nor physical circumstances of the interrogation appeared to be coercive; the questioning lasted less than 1.5 hours; he was not deceived or induced by improper promises; and the tone of the interview, as evidenced in the transcript and video, was calm, respectful, non-accusatory, and non-threatening. (See *Cunningham, supra,* 61 Cal.4th at p. 644 [statements voluntary where interview "was spread over a four-hour period" and "the tone of the questioning as evidenced in the transcript [was not] particularly harsh or accusatory"]; *People v. Whitson* (1998) 17 Cal.4th 229, 249 (*Whitson*) [finding waiver voluntary where defendant's "willingness to speak with the officers [was] readily apparent from his responses" and he was "not worn down by improper interrogation tactics, lengthy questioning, or trickery or deceit"].) Cardona even confirmed at one point during the interrogation that he was not being forced to talk to the detectives, stating that he "just want[ed] to be honest, that's all."

Although late in the interrogation Cardona asked if he "need[ed] to hire a lawyer[,]" a suspect who wishes to invoke the right to counsel "must do so 'unambiguously[,]' " and merely positing that " '[m]aybe I should talk to a lawyer' " is insufficient. (*People v. Tom* (2014) 59 Cal.4th 1210, 1225; see *Davis v. U.S.* (1994) 512 U.S. 452, 462 (*Davis*).) Under *Davis*, it is not enough that a suspect makes a reference to an attorney "that a reasonable officer in light of the circumstances would have understood" to mean "only that the suspect *might* be invoking the right to counsel." (*Davis*, at p. 459; see also *People v. Nelson* (2012) 53 Cal.4th 367, 376 (*Nelson*).) Given the ambiguous nature of Cardona's question, it was reasonable for the detectives to believe it was not a clear invocation of his right to counsel.

Additionally, "[e]ven though officers may ask questions to clarify whether the right to counsel is being invoked, they are not obligated to do so." (*Nelson*, *supra*, 53 Cal.4th at p. 377.) Here, after Cardona asked if he needed to hire a lawyer, the detective responded, "That's not for us to say. We are just trying to see if you understand why we're talking to you, why it is that you're here." The detective then followed up by asking whether Cardona "ha[d] any problem with us talking to you about this incident?" Cardona replied, "No." Thus, even though the detectives were not obligated to seek clarification about Cardona's willingness to continue speaking with them, they did so here, and there is no evidence that Cardona's statements were not voluntarily given.

Although Cardona sometimes asked for questions to be repeated or rephrased, he was generally able to answer coherently and with apparent understanding. One of the interrogating detectives testified that Cardona was alert, willing to speak with him, and answered his questions fully. The interrogation transcript and video support the detective's testimony, and

there is no evidence that Cardona's judgment was clouded or otherwise impaired during the interview by pain, medications, or medical procedures. (See *Whitson*, *supra*, 17 Cal.4th at p. 249.)

Even if some of Cardona's behavior "was irrational or bizarre, there is no evidence his 'abilities to reason or comprehend or resist were in fact so disabled that he was incapable of free or rational choice. [Citations.]' " (*Cunningham*, *supra*, 61 Cal.4th at p. 645; see, e.g., *People v. Mayfield* (1993) 5 Cal.4th 142, 204 [defendant, who may have been under the influence of drugs or his diabetic condition at the time of his lengthy interview, did not appear mentally impaired because he sounded lucid, spoke clearly albeit slowly, and at times "engaged in animated" conversation with detectives].) Although Cardona's sister mentioned to the detectives that he suffered from mental illness, it appeared that he had little difficulty understanding what was happening during the interview. Based on the totality of the evidence, including our own review of the videotaped interrogation, Cardona understood the detectives and responded appropriately to their questions.

There is also evidence in the record indicating that Cardona had prior experience with law enforcement. Cardona acknowledged at the end of his interrogation that he had previous arrests for fighting with police officers. He also mentioned being incarcerated, and the record shows he was convicted of attempted carjacking in 2007. While the record does not indicate whether Cardona was advised of his *Miranda* rights on other occasions, a defendant's prior encounters with law enforcement can be considered in determining whether a waiver was knowing and voluntary. (See, e.g., *People v. Lessie* (2010) 47 Cal.4th 1152, 1169 ["While no evidence was offered that defendant had, or had not, previously been advised of his rights under *Miranda*, . . . he was no stranger to the justice system."].) Given the totality of the

circumstances here, we conclude that Cardona impliedly waived his *Miranda* rights, and his statements were properly admitted.

Even if any error occurred, however, it was harmless beyond a reasonable doubt. Erroneous admission of statements made in violation of *Miranda* is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). Under *Chapman*, a constitutional error is harmless when it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id.* at p. 24.) Here, the evidence presented at trial included testimony from multiple eyewitnesses describing, in great detail, how Cardona punched N.J. repeatedly while N.J. was in a vulnerable prone position. An audio recording corroborated eyewitness testimony and even captured N.J.'s screams for help. Two eyewitnesses testified that at one point, Cardona reached under N.J.'s neck and forcefully pulled it backwards before releasing it and letting N.J. fall to the ground hard, after which N.J. went limp.

The responding officer further testified about how Cardona continued to try to kick N.J., even while Cardona was handcuffed and N.J. was lying motionless. Blood tested from the scene belonged to N.J. and not Cardona, which is circumstantial evidence that Cardona was the aggressor even without his own statements confirming as much. Finally, the medical examiner opined that N.J.'s injuries were consistent with witnesses' descriptions of what happened, and she concluded that "head and neck trauma" were contributing factors in N.J.'s homicide. On this record, we agree with the People that any error in admitting Cardona's statements was harmless beyond a reasonable doubt.

As for Cardona asking whether he needed a lawyer, even if Cardona's question could be viewed as an unambiguous invocation of his right to an

attorney, his question came *after* the portions of his interview that were admitted into evidence and played for the jury. Because only statements made after unambiguous invocation are inadmissible, any potential error in finding that Cardona did not clearly invoke his right to counsel would be harmless in this case. (See, e.g., *People v. Storm* (2002) 28 Cal.4th 1007, 1021 [" 'A suspect, having invoked these rights, is not subject to *further* interrogation by the police until counsel has been made available to him . . . . [Citations.]' " (Italics added.)].) Accordingly, we conclude that the trial court did not prejudicially err in admitting portions of his post-arrest statements into evidence.

IV

Lastly, Cardona contends there was insufficient evidence to support the jury's finding of guilt for second-degree murder. Specifically, he argues there was no substantial evidence that he harbored implied malice, or that his actions proximately caused N.J.'s death. We disagree and conclude that there was substantial evidence to support the jury's verdict.

*A. Governing Law*

In response to an appellant's challenge to the sufficiency of the evidence supporting his conviction, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*Nguyen, supra*, 61 Cal.4th at p. 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "[W]e review the evidence in the light most favorable to the prosecution and presume in

37

support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*) " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*Ibid.*) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid.*)

"[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] . . . 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) Implied malice may be proven by circumstantial evidence. (*People v. Smith* (2009) 178 Cal.App.4th 475, 479 ["Because intent can seldom be proven by direct evidence, it typically is inferred from the circumstances."].)

Regarding proximate cause, an act causes death if the death is the direct, natural, and probable consequence of the act, and the death would not have happened without the act. (See *People v. Cervantes* (2001) 26 Cal.4th 860, 866–874; *People v. Roberts* (1992) 2 Cal.4th 271, 315–321.) There may

38

be more than one cause of death, and an act causes death only if it is a substantial factor in causing the death.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 845–849.)  A substantial factor is more than a trivial or remote factor; however, it does not need to be the only factor that causes the death.  (See *id.* at p. 845.)  "California courts have long held 'that there may be multiple proximate causes of a homicide[.]' "  (*People v. Garcia* (2022) 82 Cal.App.5th 956, 963 (*Garcia*); see also *People v. Jennings* (2010) 50 Cal.4th 616, 643 [a defendant may be criminally liable for a result directly caused by his or her act, even though there is another contributing cause].)

    *B. Analysis*

    Here, there was substantial evidence to establish that Cardona violently attacked N.J., knowing it endangered his life, and that Cardona acted with a conscious disregard for N.J.'s life.  As noted, according to Vanessa's testimony, N.J. yelled for Cardona to stop hitting him and said, "You're going to kill me."  Although Cardona denied hearing N.J. say that, he acknowledged in his interrogation that he heard Vanessa tell him to stop hitting N.J. because he was "killing him."  The evidence shows that Cardona punched N.J. "nonstop" around his head for about ten minutes while N.J. was lying face down with his shirt pulled over his face.  Cardona also admitted post-arrest that he could have walked away from the altercation but continued to hit N.J. with his knee pressed against his back because he was "waiting for an answer" regarding his sunglasses.  Even after Cardona was handcuffed, he continued to attack N.J., who was lying motionless on the ground as the responding officer attempted to render him aid.  Cardona's interference even forced the officer to stop administering CPR to N.J. so he could restrain Cardona further, despite already deploying his taser several

39

times.  Viewed in the light most favorable to the verdict, the totality of the evidence is sufficient to support that Cardona acted with implied malice.

We also conclude there was sufficient evidence to show that Cardona's actions were a substantial factor in causing N.J.'s death.  Cardona points out that none of N.J.'s physical injuries was independently fatal, but there may be multiple contributing causes of a homicide.  (See *Garcia, supra*, 82 Cal.App.5th at p. 963.)  Similarly, although methamphetamine was found to be a contributing factor in N.J.'s death, the medical examiner testified that there was no way to single out any single factor as the cause of death.  She further testified that while the level of methamphetamine in N.J.'s blood could have caused an overdose or increased his risk of fatal cardiac arrest, N.J. also could have survived if not for his other injuries.  The defense's own expert witness testified that while N.J. may have survived the attack absent his methamphetamine use, a person "being . . . choked [while] their head is being . . . hit into the ground . . . is potentially fatal if it goes on long enough."

Lastly, testimony from Rafael and the 911 dispatcher showed that N.J. did not exhibit any obvious physical symptoms of methamphetamine use in the hour leading up to the incident, lending support to the People's theory that the concentration of methamphetamine found in N.J.'s blood was falsely elevated due to post-mortem redistribution.

The record ultimately shows that while drug use may have contributed to N.J.'s death, it did not negate evidence that Cardona's actions were a substantial factor in causing N.J.'s death.  (See *People v. Catlin* (2001) 26 Cal.4th 81, 155 [" 'So long as a victim's predisposing physical condition, regardless of its cause, is not the *only* substantial factor bringing about his death, that condition . . . in no way destroys the [defendant's] criminal responsibility for the death.' "].)

In sum, we conclude there was substantial evidence to support Cardona's second-degree murder conviction.

DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:

IRION, Acting P. J.

DATO, J.